Ella Jean BARKER, Plaintiff,

v.

HOME–CREST
CORPORATION, Defendant,

and

CNA Insurance Companies,
Defendant/Appellant,

and

Liberty Mutual Insurance Company,
Defendant/Appellee.

Supreme Court of Tennessee,
at Knoxville.

Feb. 25, 1991.

Paul D. Hogan, Jr., Knoxville, for appellant.

Shannon D. Faulkner, III, Knoxville, for appellee.

## OPINION

ANDERSON, Justice.

In this worker's compensation action, the trial court approved a settlement awarding permanent partial disability benefits to the employee for a condition known as carpal tunnel syndrome. The dispute which we address arises over which of two insurance companies providing successive coverage for the employer should be liable for the settlement. The resolution of the dispute depends on when the accidental injury occurred. The appellant, CNA Insurance Companies, contends that it was a gradual injury, occurring over a period of time, and that the accidental injury did not occur until the injury prevented the employee from working. The appellee, Liberty Mutual Insurance Company, argues that the accidental injury occurred when the condition was diagnosed, and any symptoms that occurred after that time were merely a manifestation of an already present and existing injury. The trial court held the accidental injury occurred when it was diagnosed, and that CNA Insurance Companies, who had coverage at that time, was responsible.

We disagree with the trial court and hold that the carpal tunnel syndrome condition was a gradual injury, and that the

accidental injury occurred on the date the employee's condition was sufficiently severe to prevent her from working. Accordingly, Liberty Mutual Insurance Company, the insuror when the employee stopped working, is liable for the agreed permanent partial disability settlement.

## FACTUAL HISTORY

CNA Insurance Companies ("CNA") provided worker's compensation insurance coverage to the defendant employer, Home–Crest Corporation ("Home–Crest"), at all relevant times before June 17, 1988. After June 17, 1988, Liberty Mutual Insurance Company ("Liberty") provided the same coverage to Home–Crest.

The plaintiff, Ella Jean Barker ("Barker"), was first employed by Home–Crest in April of 1986. On May 24, 1988, she was referred to Dr. Clifford Posman, an orthopedic surgeon, by Dr. Roger Carrera, the physician for Home–Crest, for symptoms of numbness and tingling in the hands, and pain in the mid-back. No time from work had been missed as a result of these symptoms. Barker thought the problem was caused by sanding kitchen cabinets at work with a 10–pound vibrating "jitterbug" sander. Dr. Posman agreed, thought the history was consistent with an overuse problem related to her occupation, and diagnosed the problem as a probable carpal tunnel syndrome. He prescribed a night brace and referred her for EMG studies of both extremities.

On June 21, 1988, Dr. Posman saw Barker again and injected the carpal tunnels with Kenalog 10 and gave her new night splints. The nerve conduction studies showed evidence of bilateral ulnar nerve disfunction, and his diagnosis was bilateral severe carpal tunnel syndrome. On July 12, 1988, Barker reported that her hands were better since she had the cortisone injection. Dr. Posman's impression then was "resolving carpal tunnel syndrome." Thereafter, he saw Barker twice in August and once in September for a back injury. In October he saw Barker for both her back and her wrist symptoms of tingling

and numbness, and recommended surgery for her carpal tunnel problem.

Finally, Barker's condition became so painful she could not continue working. She returned to Dr. Posman, and he performed surgery on March 7, 1989. The surgical procedure was an incision of the carpal ligaments in the arm, which expose the median nerves, and drain the compression of the nerves by releasing the ligament and the tissues around the nerve.

Dr. Posman continued to follow her after the surgery, again treating the carpal tunnel syndrome with cortisone and with splints. He assessed her disability at 20 percent to the body as a whole as a result of the carpal tunnel syndrome in both the right and left hands, and felt that any activity requiring repetitive hand movements should be restricted.

At trial, on February 21, 1990, the trial court approved an agreed settlement of 50 percent permanent partial disability to the body as a whole, amounting to $43,000.00, including medical expenses, and held that the defendant, CNA, was liable for the settlement award as a result of an accidental injury sustained by Barker during CNA's coverage period ending June 17, 1988.

## ACCIDENTAL INJURY

■ Our review of findings of fact by the trial court is *de novo* upon the record of the trial court, accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise. Tenn.Code Ann. § 50–6–225(e); *Lollar v. Wal–Mart Stores, Inc.,* 767 S.W.2d 143 (Tenn.1989). "This standard differs from that previously provided and requires this Court to weigh in more depth factual findings and conclusions of trial judges in workers' compensation cases." *Humphrey v. David Witherspoon, Inc.,* 734 S.W.2d 315 (Tenn.1987).

The appellant, CNA, argues that Barker suffered a gradual injury—a nerve injury which developed over a period of time—and that the accidental injury did not occur until Barker became disabled, and she did not become disabled until she stopped

working and surgery was performed. The appellee, Liberty, argues that the accidental injury occurred on and prior to May 24, 1988; that it was diagnosed at that time; that Barker sustained a disabling injury at that time; and that anything that occurred after that time symptom-wise was merely a manifestation of an already present and existing injury.

Our analysis begins with an examination of the origin of the gradual injury rule, and the problem of fixing the time of the injury. Professor Larson comments:

> This repeated-trauma or cumulative-trauma doctrine appears to have originated with the House of Lords decision in *Burrell & Sons, Ltd. v. Selvage* [90 L.J. 1340 (H.L.1921) ], in which compensation was awarded for the disabling cumulative effect of a long series of cuts and scratches leading to infection and arthritis....
>
> ....
>
> The practical problem of fixing a specific date for the accident has generally been handled by saying simply that the date of accident is the date on which disability manifests itself. Thus, in [*Ptak v. General Elec. Co.*, 13 N.J.Super. 294, 80 A.2d 337 (1951) ], the date of a gradually acquired sacroiliac strain was deemed to be the first moment the pain made it impossible to continue work....

1B Larson, *Workmen's Compensation Law* § 39.40 and § 39.50 (1987), citing in accord *Brown Shoe Co. v. Reed*, 209 Tenn. 106, 350 S.W.2d 65 (1961). *See also* Note, *Workmen's Compensation—Gradual Injuries*, 29 Tenn.L.Rev. 477 (1962).

This Court, in *Brown Shoe Co. v. Reed*, 209 Tenn. 106, 350 S.W.2d 65 (1961), found the employee suffered a gradual injury while operating a shoe sole trimming machine. Constant maneuvering of the left arm caused the ulnar nerve to repeatedly move in and out of position. We held the date of the accidental injury was the date on which the condition finally prevented the plaintiff from performing his work.

This Court re-affirmed, in *St. Paul Insurance Company v. Waller*, 524 S.W.2d 478 (Tenn.1975), that

> [w]e are aligned with the majority of jurisdiction in allowing compensation for conditions that do not occur instantaneously as the result of one accident, but develop gradually over varying periods of time, resulting from repeated work related incidents.

*Id.* at 481. We found that compensation could be awarded for conditions which do not occur instantaneously as a result of a single accident, but develop gradually from repeated work-related incidents, and held the date of the accidental injury occurred when plaintiff's condition reached the point that he could no longer work at his job.

Appellee argues that the accidental injury occurred prior to June 17, 1988, and that the complaints and surgery after this date were merely a manifestation of her original injury, not a second injury or the culmination of a gradual injury. The appellee cites *Mynatt v. Liberty Mutual Insurance Co.*, 699 S.W.2d 799 (Tenn.1985), as controlling in this case. We find the case inapposite, because our holding in that case was that the accidental back injury was suffered on a specific date and was not a gradual injury, even though pain continued and the employee quit work approximately six months later. We commented,

> While in some cases an employee's back injury has been found to have occurred gradually and not as the result of a specific incident, *see* e.g. *Waller, supra*, we have never held that back injuries are always gradual injuries. Each case must be decided on its facts based upon the proof relating to causation.

*Mynatt*, 699 S.W.2d at 800.

In order to resolve the dispute between the competing insurance carriers, we must determine as a matter of fact whether or not this was an accidental injury which occurred on and prior to May 24, 1988, the symptoms occurring thereafter being simply manifestations of the original injury, or whether this was a gradual injury which continued to develop up to the time of surgery in March of 1989. Our analysis of the evidence begins with noting that Dr. Posman's initial diagnostic impression on May 24, 1988, was probable carpal tunnel

syndrome, and that the definitive diagnosis on June 21, 1988, after nerve conduction studies, was bilateral severe carpal tunnel syndrome. It is plain from the testimony of Barker that after her injury was diagnosed in May 1988, it got better and then got worse, and then in November of 1988, when she was transferred to the framing department at Home–Crest and began to stretch her hands, it got worse. In her words:

So then I began to stretch my hands, you know, more and more every day and began to get worse and worse. Then I had surgery, and it got better and then it got worse.

It is also apparent that new trauma was being caused by the repetitive movements of her hands each day at work. Dr. Posman testified:

Q. Doctor, would it be a fair statement to say that every time she worked and used repetitive movements of her wrist, that she was causing additional trauma to the carpal tunnel?

A. I think that's a fair statement.

Dr. Posman also makes it clear that both the cause and the condition were continuing, in these illuminating exchanges with Liberty's counsel:

Q. Mr. Rosson asked you a question about the causation of this carpal tunnel syndrome and I believe your answer was that it happened over a period of time; it was caused by repetitive motions of the arms. And whatever the cause and the factor was, it occurred over a period of time up to May 24th of 1988?

A. And probably continued after May 24, 1988.

Q. Okay.

A. Up until the time she had surgery and then even when surgery was not completely cured and she had what is called some dynamic problems which continued even after surgery.

. . . .

Q. Okay, whatever occurred after that date, would it be fair to say that it was a manifestation of the symptoms, the numbness, and the pain, the underlying condition was already there as of May of 1988?

A. Well, I don't look at this the same way I think you do. I think that basically she has a problem with compression of the median nerves at the wrist, and this compression can get better and can get worse depending on how much she uses her hands and there already was some swelling in the carpal tunnels, which was compressing the nerve and as she started to use her hands more, she got more compression. As she rested, she got a little bit less compression. The problem never went away after nine months of conservative treatment, and therefore, we decided to perform surgery.

Dr. Posman concluded by saying he thought "there was some progression of the numbness and tingling and pain, which was occurring both on and off the job, both with activity and also at night, which is characteristic of carpal tunnel syndrome" up to the time when surgery was required in March of 1989.

We find the foregoing evidence preponderates in favor of the position that this was a gradual injury, both before and after May 24, 1988, and that it continued at least until Barker could no longer perform her work in March of 1989, which we find to be the time the accidental injury occurred.

Accordingly, for the reasons above cited, we reverse the decision of the trial court and hold that Liberty Mutual Insurance Company must bear the responsibility for the agreed worker's compensation disability settlement. Costs of the appeal are assessed against the Appellee, Liberty Mutual Insurance Company.

DROWOTA, O'BRIEN and DAUGHTREY, JJ., and TIPTON, Special Judge, concur.